TREG R. TAYLOR
ATTORNEY GENERAL

Thomas S. Flynn (Alaska Bar No. 1910085)
Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-6612
Facsimile: (907) 258-4978
Email: thomas.flynn@alaska.gov

Attorney for the State of Alaska

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| Public Interest Legal Foundation, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:22-cv-00001-SLG |
| | ) | |
| Kevin Meyer, in his official capacity as | ) | |
| Lieutenant Governor for the State of | ) | **MOTION TO DISMISS** |
| Alaska, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

The Public Interest Legal Foundation, Inc. ("PILF") demands that the State of

Alaska disclose information about deceased voters under the disclosure provision in the

National Voter Registration Act (NVRA). But the NVRA does not require disclosure of

third-party reports containing sensitive personal information. It requires only the

disclosure of records "concerning the implementation" of specified "programs and

activities." The Division of Elections has already provided these records, by sending

PILF the list of deceased voters it removed from Alaska's voter registration list. While the Division reviews many records to maintain the voter registration list, only those records concerning the implementation of "programs" and "activities" are subject to disclosure. PILF's broad reading of the NVRA is incorrect and counter to the statute's purposes. Because the Division complied with the NVRA and other federal laws, PILF's Complaint should be dismissed.

## BACKGROUND

### I. National Voter Registration Act

Congress passed the NVRA in 1993, finding that United States citizens have a fundamental right to vote, that all levels of government should promote the exercise of that right, and that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation," which "disproportionately harm voter participation by various groups, including racial minorities."[1] The express purpose of the NVRA was to increase the number of registered voters, enhance the participation of voters, "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained."[2] The NVRA "was not designed as a tool to root out voter fraud, 'cross-over voting,' or any other illegal or allegedly illegal activity associated with casting a ballot on election day."[3]

---

[1]     52 U.S.C. § 20501(a).

[2]     52 U.S.C. § 20501(b).

[3]     *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 722 (S.D. Miss. 2014).

To meet its goals, the NVRA requires states to allow voter registration for federal elections by mail, in person, and when applying for a driver's license.[4] States can only remove a registered voter from the rolls if the voter requests it, the voter is criminally convicted or mentally incapacitated, the voter dies, or the voter changes residence.[5] All state programs or activities to protect the integrity of the electoral process and maintain voter rolls must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965," and cannot result in a person's removal from an eligible voter list except in limited circumstances.[6]

The NVRA also requires that state agencies maintain and make available to the public certain records regarding voter registration programs and activities. Specifically, the "[p]ublic disclosure of voter registration activities" provision ("Disclosure Provision") directs that:

> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

> (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each

---

[4]     52 U.S.C § 20503(a); s*ee* 52 U.S.C. § 20506 (listing voter registration agency responsibilities).

[5]     52 U.S.C. §§ 20507(a)(3), (4).

[6]     52 U.S.C. § 20507(b).

such person has responded to the notice as of the date that inspection of the records is made.[7]

## II.    ERIC and the Limited Access Death Master File

Since 2016, Alaska has been a member of the Electronic Registration Information Center ("ERIC"), an organization that helps states improve the accuracy of their voter rolls and "increase access to voter registration for all eligible citizens."[8] All member states are required to sign an agreement which sets forth the terms and conditions of ERIC membership.[9] Pursuant to the agreement, Alaska provides ERIC with voter registration information, including voter files and information from the State's motor vehicles database, every 60 days.[10] ERIC then processes the data and provides reports to each member state.[11] Those reports list voters who have moved within the state, have left the state, have died, are registered more than once, and are eligible but have not registered to vote.[12]

ERIC uses the Social Security Administration's "Death Master File" to identify voters who have died.[13] The Death Master File contains "the name, social security

---

[7]     52 U.S.C. § 20507(i).

[8]     Doc. 1 at ¶¶ 9, 13.

[9]     *Id.* at ¶ 14 (citing ERIC Bylaws, Art. II, Sec. 3).

[10]    *Id.* at ¶ 15 (citing ERIC Bylaws, Exhibit A (Membership Agreement), Sec. 2(b)).

[11]    *Id.* at ¶ 17.

[12]    *Id.* ¶ 18.

[13]    *Id.* at ¶ 19. PILF refers to part of this information as the "Deceased Data," *id.* at ¶ 20, alleging that Alaska uses the "Deceased Data to conduct voter list maintenance

account number, date of birth, and date of death of deceased individuals maintained by the Commissioner of Social Security."[14] Given the sensitive nature of this information, federal law limits access to it to certified entities;[15] the database is therefore known as the Limited Access Death Master File (LADMF). Federal law also expressly prohibits the disclosure of information contained in the LADMF in response to Freedom of Information Act requests.[16]

To receive access to the LADMF, an entity must certify that in seeking the information it has either "a legitimate fraud prevention interest" or "legitimate business purpose pursuant to a law, government rule, regulation, or fiduciary duty."[17] It must also certify that it has "systems, facilities, and procedures in place . . . to safeguard such information" in compliance with Internal Revenue Service requirements.[18] Any misuse or unauthorized disclosure of the information contained in the LADMF by a certified entity may result in financial penalties.[19]

---

programs and activities required by state law and the NVRA, including the cancellation of registrations belonging to deceased individuals," *id.* at ¶ 24.

[14]     42 U.S.C. § 1306c(d).

[15]     *See* 42 U.S.C. § 1306c(b)(1)-(2) (describing certification program); 15 C.F.R. § 1110.102 (same).

[16]     *See* 42 U.S.C. § 1306c(e)(1).

[17]     42 U.S.C. § 1306c(2)(A)(i)-(ii).

[18]     42 U.S.C. § 1306c(2)(B)(C); *see* 26 U.S.C. § 6103(p)(4).

[19]     42 U.S.C. § 1306c(c).

ERIC has access to the LADMF and provides the information it contains to member states so that they can use it to implement their list maintenance programs.[20]

## III. PILF's NVRA Request

In August 2021, PILF requested records under the NVRA's Disclosure Provision.[21] PILF's stated aim is to promote the "integrity of elections nationwide through research, education, remedial programs, and litigation."[22] It frequently uses the Disclosure Provision to request records and determine "whether lawful efforts are being made to keep voter rolls current [and] whether eligible registrants have been improperly removed from voter rolls."[23]

PILF requested two categories of records: (1) "All 'ERIC Data' received from ERIC during the years 2019, 2020, and 2021 concerning registered voters identified as deceased or potentially deceased" and (2) "All reports and/or statewide-voter-registration-system-generated lists showing all registrants removed from the list of eligible voters for reason of death for the years 2019, 2020, and 2021."[24] PILF specified that the second category "will optimally include unique voter identification numbers, county or locality, full names, addresses, and dates of birth."[25]

---

[20]     *See* Doc. 1 at ¶ 19.

[21]     *Id.* at ¶ 31; *see* 52 U.S.C. § 20507(i).

[22]     Doc. 1 at ¶ 4.

[23]     *Id.*

[24]     *Id.* at ¶ 31 (footnote omitted).

[25]     *Id.* at ¶ 31.

## IV.    The Division's Response

In September 2021, the Division largely granted PILF's second request.[26] The Division provided PILF with "a list of deceased voters DOE removed from the voter registration list between January 1, 2019 and August 11, 2021."[27] The list included identification numbers unique to each voter.[28] Notably, by providing data from more than two years ago, the Division maintained and provided more information than strictly required by the NVRA.[29] The Division did, however, exclude voters' dates of birth because this information is confidential under Alaska law and federal precedent.[30]

The Division denied PILF's first request.[31] The Division explained that, even assuming the Disclosure Provision applied, the Division could not provide the ERIC data identifying deceased voters because federal law "protects the information in the Death Master File and permits disclosure only to certified entities."[32] The Division also

---

[26]    *Id.* at ¶ 34-35.

[27]    *Id.* at ¶ 34; Doc. 1-2 at 1.

[28]    Doc. 1-2 at 1 (recognizing that the Division only withheld dates of birth).

[29]    *See* Doc. 1-2 at 1; *see also* 52 U.S.C. § 20507(i)(1) (requiring states maintain certain documents for at least two years).

[30]    Doc. 1 at ¶ 35; Doc. 1-2 at 1 (citing AS 15.07.195; *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1345 (N.D. Ga. 2016); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 732-33 (S.D. Miss. 2014)).

[31]    *See* Doc. 1 at ¶ 32-33.

[32]    *See* Doc. No. 1-2 at 1 (citing 42 U.S.C. § 1306c; 15 C.F.R. 1110.102).

highlighted that the NVRA is subject to provisions in the Driver's Privacy Protection Act.[33]

## V.    PILF's Lawsuit

Shortly after it received the Division's records, PILF sent the Division a letter alleging a violation of the NVRA's Disclosure Provision.[34] PILF claimed that the Disclosure Provision "exempts only two pieces of information—(1) a declination to register to vote, and (2) the identity of a voter registration agency through which any particular voter is registered."[35] The letter asserted that PILF did "not seek either of those things and the NVRA exempts no other records," and any Alaska law that limited the disclosure of the requested records was "without force" with respect to the NVRA.[36]

PILF stated that the Division could satisfy its request by providing the ERIC reports with the redaction of all data elements from the LADMF, including dates of birth/death and full/partial social security numbers.[37] The Division did not repeat its previous response to PILF's request.[38]

---

[33]    *See id.* (citing *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 563 (M.D. Pa. 2019)). The Driver's Privacy Protection Act forbids state motor vehicle departments from knowingly disclosing personal information contained in their records except in limited circumstances. *See* 18 U.S.C. §§ 2721(a), (b).

[34]    Doc. 1 at ¶ 36-37 (citing 52 U.S.C. § 20507(i)).

[35]    Doc. No. 1-3 at 2.

[36]    *Id.*

[37]    *Id.* at 3.

[38]    Doc. 1 at ¶ 42.

Case 1:22-cv-00001-SLG     Document 40     Filed 09/12/22     Page 8 of 33

In January 2022, PILF filed this action, alleging that the Division's partial denial of its records request violated the Disclosure Provision.[39] PILF seeks declaratory and injunctive relief, in addition to attorneys' fees and costs.[40] Despite its earlier offer, PILF demands the deceased voter reports the Division received from ERIC without any redactions to account for the LADMF.[41] PILF also demands the list of deceased voters the Division removed from the rolls with unique voter identification numbers—even though the Division provided unique identification numbers and PILF did not previously demand them, noting that the Division only redacted voters' dates of birth.[42]

The Division moves to dismiss PILF's claim under Federal Rule of Civil Procedure 12(b)(6).

---

[39] *Id.* at ¶¶ 53-59. PILF also sued two other states on nearly identical grounds. *Public Interest Legal Foundation v. Evans*, No. 1:21-cv-03180 (D.D.C., filed Dec. 6, 2021); *Public Interest Legal Foundation v. Griswold*, No. 1:21-cv-03384 (D. Colo., filed Dec. 16, 2021).

[40] Doc. 1, Prayer for Relief ¶¶ 1-7.

[41] PILF's Prayer for Relief asks for, among other things, the court to "Order[] Defendant to provide the requested records to the Foundation, including voter list maintenance records received from ERIC." Doc. 1, Prayer for Relief ¶ 4.

[42] *Id.* (requesting deceased cancellation reports with voter identification numbers); Doc. 1-2 at 1 (recognizing that the Division only withheld dates of birth); Doc. 1-3 at 2–3 (recognizing that the Division did not include dates of birth and demanding only redacted versions of ERIC's deceased voter reports, not the Division's list of removed voters with unique voter identification numbers).

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[43] "A claim is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"[44] "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."[45] "[C]onclusory allegations of law and unwarranted inferences are insufficient" to avoid dismissal under Rule 12(b)(6).[46]

## ARGUMENT

**I.      PILF fails to state a claim for ERIC's deceased voter reports under the plain language of the NVRA.**

PILF's sole claim is that it has suffered an informational injury under the NVRA because the Division's partial denial of its request has "frustrat[ed], imped[ed], and harm[ed] its efforts to carry out its organizational mission."[47] But the Division's response

---

[43]      *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[44]      *League of Conservation Voters v. Trump,* 303 F. Supp. 3d 985, 992 (D. Alaska 2018).

[45]      *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

[46]      *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009) (quoting *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 n.5 (9th Cir. 2005)).

[47]      Doc. 1 at ¶¶ 47-59.

does not violate the NVRA because the statute's plain language does not require the Division to disclose the deceased voter reports it received from ERIC.

Statutory interpretation begins with the "language of the statute itself."[48] And, absent a contrary definition, words are interpreted according to "their ordinary, contemporary, common meaning."[49] Moreover, "words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[50] "If the language has a plain meaning or is unambiguous, the statutory interpretation inquiry ends there."[51]

The NVRA requires the disclosure of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."[52] This statute includes unambiguous limiting language, beginning with "implementation." "Without the word [implementation], the provision would be broader, requiring disclosure simply of 'all records relating to programs and activities . . . .'"[53] But with the word "implementation," the statute "restrict[s] the scope of the records required to be disclosed" to only those "relating to the

---

[48]     *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953 (9th Cir. 2009) (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987)).

[49]     *Id.* (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

[50]     *Id.* (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 128 (2000)).

[51]     *CVS Health Corp. v. Vividus*, LLC, 878 F.3d 703, 706 (9th Cir. 2017).

[52]     52 U.S.C. § 20507(i)(1).

[53]     *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1339 (N.D. Ga. 2016).

processes a State implements to fulfill its NVRA obligations."[54] "If Congress intended a broad disclosure requirement encompassing information more granular than process information, it is unclear why it chose to include the word 'implementation' at all."[55]

The scope of the Disclosure Provision is further limited by the use of the terms "programs" and "activities."[56] Based on common dictionary definitions, "program" and "activity" mean the provision applies to records "relate[d] to fulfilling, performing, carrying out, or putting into effect by means of a definite plan or procedure (1) systems or (2) specific actions to ensure that the State's official list of individuals entitled to vote is current and accurate."[57] These terms require disclosure of records regarding implementation of a "schedule or system designed to serve a specific end, or a particular function or operation, 'conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.'"[58]

As limited by these terms, the Disclosure Provision cannot require the disclosure of all Division records; it only requires the disclosure of records that show the specific actions the Division is taking under the NVRA. It requires the Division to show *what* it is doing and *how*. It does not require the Division to produce every "granular" input it

---

[54]   *Id.*

[55]   *Id.*

[56]   52 U.S.C. § 20507(i)(1).

[57]   *Kemp*, 208 F. Supp. at 1338.

[58]   *Boockvar*, 431 F. Supp. 3d at 559 (quoting 52 U.S.C. § 20507(i)(1)).

Case 1:22-cv-00001-SLG   Document 40   Filed 09/12/22   Page 12 of 33

considers, particularly when those inputs are third-party reports that contain voters' sensitive personal information.[59] To hold otherwise would be to ignore the plain language of the Disclosure Provision.

Here, PILF does not state a claim because it does not seek records within the plain meaning of the NVRA's Disclosure Provision. PILF demands ERIC's data from the years 2019, 2020, and 2021 "concerning registered voters identified as deceased or potentially deceased."[60] But this information need not be disclosed because all the data the Division reviews in the course of "programs and activities" is not the same as "records concerning the *implementation* of programs and activities."[61] The Division has a program to ensure the accuracy and currency of the voter list by removing deceased voters, in accordance with the NVRA.[62] It implements this program by removing deceased voters. The Division provided implementation records when it provided PILF a record of the voters it removed in 2019, 2020, and 2021.[63] The inputs the Division considered, including ERIC's deceased voter reports, are not implementation records subject to the NVRA.

PILF does not even allege that the ERIC deceased voter reports are implementation records. It alleges that the deceased voter reports are used to "conduct

---

[59]    *Kemp*, 208 F. Supp. 3d at 1339.

[60]    Doc 1. at ¶ 31 (internal quotation marks omitted).

[61]    52 U.S.C. § 20507(i)(1).

[62]    *See id.*; 52 U.S.C. § 20507(a)(4)(A).

[63]    Doc. 1 at ¶ 34; Doc. 1-2 at 1.

voter list maintenance programs and activities;"[64] that "Alaska receives data from ERIC showing registrants who are deceased or likely deceased;"[65] and that Alaska must, "at a minimum, initiate contact with those voters in order to correct the inaccuracy or obtain information sufficient to inactivate or update the voters' records."[66] But to withstand a motion to dismiss under Rule 12(b)(6), a complaint "requires more than labels and conclusions" to establish grounds for relief.[67] The ERIC deceased voter reports do not concern the implementation of any Division program or activity. To implement is "to carry out, especially to give practical effect to and ensure actual fulfillment by concrete measures" or "to fulfill; perform; carry out or to put into effect according to or by means of a definite plan or procedure."[68] The deceased voter reports are third-party reports provided to the Division that contain information on potentially deceased voters. PILF does not allege that these reports contain any information regarding Division programs or activities, much less their implementation.

Instead, PILF attempts to paint the Disclosure Provision with a broad brush, emphasizing "all records" in bold and underlined text.[69] But PILF's interpretation would render the word "implementation" void. Had Congress intended the result PILF seeks, it

---

[64]   Doc. 1 at ¶ 24.

[65]   *Id.* at ¶ 20

[66]   *Id.* at ¶ 21 (cleaned up) (quoting Membership Agreement, Sec. 5(b)).

[67]   *Twombly*, 550 U.S. at 555.

[68]   *Kemp*, 208 F. Supp. 3d at 1337.

[69]   Doc. No. 1-3 at 2.

would not have explicitly used the word "implementation"—a word that does not otherwise appear in the NVRA—to limit the provision's scope.[70] This term must be given effect.[71]

To be sure, the Disclosure Provision requires the disclosure of some records, just not those PILF demands. Courts have found several types of records relate to the implementation of programs and activities, including voter registration applications and voter rolls.[72] And there are specific records the NVRA requires states to maintain, including records of those who were sent notices and whether or not they responded.[73] But courts have also found that some records and information need not be disclosed, like voter telephone numbers, letters to registration applicants, precinct registers, and absentee

---

[70]    The word "implement" appears twice in the statute. *See* 52 U.S.C. § 20501(b)(2) (noting one purpose of the statute is "to make it possible for . . . governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for federal office"); 52 U.S.C. § 20506(c)(1) ("Each State and the Secretary of Defense shall jointly develop and implement procedures for persons to apply to register to vote at recruitment offices of the Armed Forces of the United States").

[71]    *See Connell v. Lima Corp.*, 988 F.3d 1089, 1097 (9th Cir. 2021) (noting courts' obligation "to give effect, if possible, to every word Congress used" without rendering words void (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979))); *see also Loughrin v. United States*, 573 U.S. 351, 358 (2014) (noting that a "cardinal principal" of statutory interpretation is "giv[ing] effect, if possible, to every clause and word of a statute" (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000))).

[72]    *See, e.g.*, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 333 (4th Cir. 2012) (voter registration applications); *Kemp*, 208 F. Supp. 3d at 1342 (records concerning processing of voter registration applications); *Hosemann*, 43 F. Supp. 3d at 723 (state voter roll).

[73]    52 U.S.C. §§ 20507(i)(2), (d)(2).

Case 1:22-cv-00001-SLG    Document 40    Filed 09/12/22    Page 15 of 33

ballot applications.[74] And no court has found that third-party reports, such as those that ERIC provides to its member states and that include sensitive personal information from the Social Security Administration, are subject to disclosure.[75]

Because PILF has failed to state a claim for relief under the plain language of the Disclosure Provision, no further analysis is necessary.[76] PILF's complaint about ERIC's deceased voter reports should be dismissed.

## II. The NVRA's legislative history, purpose, and interaction with other laws confirms that ERIC's deceased voter records are not subject to disclosure.

Should the Court find that the language of the Disclosure Provision is ambiguous, the NVRA's broader context, legislative history, purposes, and interaction with other federal laws demonstrate that the ERIC records sought by PILF are beyond the provision's scope. "If [a] statute's terms are ambiguous, [a court] may use canons of

---

[74]     *See, e.g.*, *Kemp*, 208 F. Supp. 3d at 1342-43 (applicant telephone numbers, when a voter registration application was received, and disposition of, and any response to, letters sent to voter registration applicants); *Hosemann*, 43 F. Supp. 3d at 725 ("poll books" reflecting only active status voters); *id.* at 727-28 (absentee ballot applications and envelopes).

[75]     Decisions are pending in district courts in Washington, D.C. and Colorado. *Public Interest Legal Foundation v. Evans*, No. 1:21-cv-03180 (D.D.C., filed Dec. 6, 2021); *Public Interest Legal Foundation v. Griswold*, No. 1:21-cv-03384 (D. Colo., filed Dec. 16, 2021).

[76]     *Steinle v. City & Cty. of San Francisco*, 919 F.3d 1154, 1164 (9th Cir. 2019) (noting that judicial inquiry ends if statutory text is unambiguous).

construction, legislative history, and the statute's overall purpose to illuminate Congress's intent."[77] Addressing each of these, PILF has failed to state a claim.

## A. The full NVRA and its legislative history do not support a broad reading of the Disclosure Provision.

The broader context of the NVRA and the Disclosure Provision confirm that the ERIC records sought by PILF do not constitute records of the "implementation of programs and activities."[78] Courts must bear in mind "the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[79] "[A] word is known by the company it keeps . . . to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'"[80] So construed, the Disclosure Provision does not apply to ERIC's deceased voter reports.

---

[77]     *Jonah R. v. Carmona*, 446 F.3d 1000, 1005 (9th Cir. 2006); *see Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1073 (9th Cir. 2016) (noting that courts will look to a statute's context, "broader structure," and "object and policy" when its terms are ambiguous); *see also United States v. Fiorillo*, 186 F.3d 1136, 1153 (9th Cir. 1999) (noting that statutes "should not be interpreted in a manner that renders other sections of the same statute 'inconsistent, meaningless, or superfluous'" (quoting *Boise Cascade Corp. v. U.S. E.P.A.*, 942 F.2d 1427, 1432 (9th Cir. 1991))).

[78]     *See King v. Burwell*, 576 U.S. 473, 486 (2015) ("[O]ftentimes the 'meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.'" (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000))).

[79]     *Id.* at 492.

[80]     *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (quoting *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961)).

The terms "implementation," "programs," and "activities" necessarily refer to processes that can result in actual changes to voter registration lists. Read together, they imply a project that a state actively pursues. But here, PILF seeks records that the Division simply reviews. Congress did not intend for terms like these to apply to the mere receipt and review of information from a third-party. Broadly interpreting the Disclosure Provision as somehow reaching everything the Division reviews would be inconsistent with the NVRA as a whole, which is aimed at increasing voter registration and maintaining voter rolls, not mandating the indiscriminate disclosure of state records.[81]

The NVRA's legislative history resolves any remaining ambiguity and demonstrates that sensitive personal information and third-party records are not subject to disclosure.[82] The Disclosure Provision originated in the Senate's version of the NVRA and was ultimately incorporated into the House's version, which would later become law.[83] The Senate Committee Report explains how the provision was intended to apply to information about the accuracy of voters' addresses:

---

[81]     *See Gila River Indian Cmty. v. United States*, 729 F.3d 1139, 1145 (9th Cir. 2013) ("Our goal is to understand the statute 'as a symmetrical and coherent regulatory scheme' and to 'fit, if possible, all parts into a harmonious whole.'" (quoting *Brown & Williamson*, 529 U.S. at 133)).

[82]     *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 848 (9th Cir. 2011) ("If the statutory language is ambiguous, then [courts] consult legislative history.").

[83]     *Compare* S. 460, 103rd Cong. § 8(i) *with* National Voter Registration Act of 1993, Pub. L. No. 103-31, 107 Stat. 77 (codified as amended at 52 U.S.C. § 20507(i)). A similar report accompanied Senate Bill 250, *see* S. Rep. 102-60 (1991), which passed both houses in the 102nd Congress (the National Voter Registration Act of 1992) but was subsequently vetoed. *See* S. Rep. No. 103-6, at 4 (1993).

Subsection (i) provides that each State shall maintain for two years all records concerning the implementation of programs and activities conducted for the purpose of ensuring *the accuracy and currency of addresses* on the official list of eligible voters . . . The records shall include lists of names *and addresses* of all persons to whom notices were sent and information concerning whether or not each person has responded to the notice as of the date of inspection.[84]

Thus, Congress did not intend for the Disclosure Provision to reach records beyond those relating to the accuracy and currency of voters' addresses.

This intent aligns with the language of the statute. What eventually became subsection (i)(2) requires that records of the names and addresses of individuals who receive change-of-residency notices, and whether or not they responded, are subject to disclosure.[85] Given that subsection (i)(2) explicitly mentions names and addresses, this mandatory language indicates that the Disclosure Provision is primarily directed at records of where voters live. While subsection (i)(1) does not mention names and addresses, and "shall include" is not necessarily exclusive language, nothing in the legislative history supports PILF's contention that the Disclosure Provision should be broadly construed. Congress did not intend to make all voter-related information, especially sensitive personal information and third-party reports, subject to public

---

[84]     S. Rep. No. 103-6, at 35 (1993) (emphasis added).

[85]     *See* 52 U.S.C. § 20507(i)(2) (providing that "records maintained pursuant to paragraph (1) shall include lists of the names and addresses . . .").

disclosure. Any other interpretation would be overly inclusive and unduly broad given the NVRA as a whole and its legislative history.[86]

**B.    Other federal laws similarly limit the scope of the Disclosure Provision.**

Federal laws passed before and after the NVRA further illuminate Congress's intent and show that PILF's interpretation of the Disclosure Provision is too broad.

"Statutory language 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"[87] When interpreting statutes, courts must "assume Congress is knowledgeable about existing law pertinent to the legislation it enacts."[88] Courts must also "aim[] for harmony over conflict in statutory interpretation" because it is the "job of Congress by legislation . . . both to write the law[s] and to repeal them."[89] This fundamental principle applies with equal force to the NVRA: "the term 'all records' in the disclosure provision does not encompass any relevant record from any source whatsoever, but must be read in conjunction with the

---

[86]     *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 21 (2013) (Kennedy, J., concurring in part and in the judgment) ("Courts must be careful not to give an unduly broad interpretation to ambiguous or imprecise language Congress uses.").

[87]     *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012)). *See Brown & Williamson*, 529 U.S. at 133 (noting that "the meaning of one statute may be affected by other Acts").

[88]     *Frank's Landing Indian Cmty. v. Nat'l Indian Gaming Comm'n*, 918 F.3d 610, 616 (9th Cir. 2019).

[89]     *Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027, 1034 (9th Cir. 2020) (quoting *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624, (2018)).

various statutes enacted by Congress to protect the privacy of individuals and confidential information held by certain governmental agencies."[90]

PILF's broad interpretation of the Disclosure Provision would have it implicitly repeal two laws in effect when the NVRA became law in 1993:[91] the Freedom of Information Act (FOIA) and the Privacy Act. These laws address the disclosure of government records and the protection of private information possessed by government agencies, respectively.[92] FOIA, for example, protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."[93] The Disclosure Provision in the NVRA "was not drafted in a vacuum," but was passed almost 40 years after FOIA and almost 20 years after the Privacy Act.[94] Both of these laws "express Congress's concern for individuals' privacy interests" and "[i]t is hard to imagine that in enacting the NVRA, Congress intended to abrogate all protections provided for by Federal and State laws against the disclosure of private and confidential information."[95] Such "[i]mplied repeals are not favored by the courts, 'and will only be found when the new statute is clearly

---

[90]    *Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021) ("NCBOE").

[91]    National Voter Registration Act of 1993, Pub. L. No. 103-31, 107 Stat. 77 (effective January 1, 1995).

[92]    *See, e.g.*, 5 U.S.C. § 552; 5 U.S.C. § 552a.

[93]    5 U.S.C. § 552(b)(6).

[94]    *Hosemann*, 43 F. Supp. 3d at 735.

[95]    *Id.*

repugnant, in words or purpose, to the old statute.'"[96] This follows another "basic canon of statutory construction [which] requires that [courts] presume Congress does not silently abrogate existing law."[97]

Accordingly, the Disclosure Provision is limited not just by its terms but also by other federal laws. It does not apply to "all records," as PILF would have it, but only to implementation records of specified programs and activities and only to the extent such records are not otherwise protected by federal law.[98] ERIC's deceased voter reports include sensitive personal information that implicates the privacy interests protected by FOIA and the Privacy Act. The Court should not read the Disclosure Provision to implicitly repeal these prior laws.[99]

Nor should it read the Disclosure Provision to implicitly abrogate subsequent federal laws. Nearly 20 years after the NVRA, Congress passed the Bipartisan Budget Act of 2013. This included requirements for a certification program in order to access Social Security Administration records containing sensitive personal information on

---

[96] *Nw. Forest Res. Council v. Pilchuck Audubon Soc.*, 97 F.3d 1161, 1166 (9th Cir. 1996) (quoting *Grindstone Butte Project v. Kleppe*, 638 F.2d 100, 102 (9th Cir. 1981)).

[97] *Flores v. Sessions*, 862 F.3d 863, 875 (9th Cir. 2017).

[98] *Boockvar*, 431 F. Supp. 3d at 563.

[99] *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007) (noting that subsequent legislation "can sometimes operate to amend or even repeal an earlier statutory provision" but the presumption is against implied repeals absent "clear and manifest" intent).

recently deceased individuals.[100] It restricts the disclosure of any information in the LADMF to entities that have been certified to receive the information and it sets financial penalties for any unauthorized disclosures.[101]

ERIC's deceased voter reports are based on the LADMF and therefore not subject to disclosure under the NVRA. ERIC is a certified entity and its deceased voter reports contain information from the LADMF.[102] To reveal the identity of those in the deceased voter reports would be to reveal the contents of the LADMF. This information is protected by the Bipartisan Budget Act of 2013, which Congress passed with full knowledge of the NVRA's Disclosure Provision. Just as Congress was well aware of FOIA and the Privacy Act when it passed the NVRA, so too was it aware of the NVRA when it passed the 2013 law. The best way to harmonize these statutes is a reading of the Disclosure Provision that does not require the disclosure of sensitive personal information, particularly that originating in the LADMF.[103] If the Disclosure Provision required the disclosure of information originating in the LADMF, then the Disclosure

---

[100]    *See* 42 U.S.C. § 1306c(b); 15 C.F.R. § 1110.

[101]    *See* 42 U.S.C. §§ 1306(a), (c).

[102]    *See* Doc. 1 at ¶ 19; Doc. 1-3 at 3 (recognizing that ERIC's deceased voter reports contain information protected by the LADMF).

[103]    *See Frank's Landing*, 918 F.3d at 616 ("We assume Congress is knowledgeable about existing law pertinent to the legislation it enacts . . . ." (citation omitted)).

Provision would vitiate the subsequent LADMF protections. Congress could not have intended this absurd result.[104]

Courts have already recognized that the Disclosure Provision does not apply to information protected by another subsequent law, the Driver's Privacy Protection Act (DPPA).[105] This prohibits the disclosure of "personal information . . . about any individual obtained by [a Division of Motor Vehicles (DMV)] in connection with a motor vehicle record" except in limited circumstances.[106] Accordingly, if NVRA requests "implicate protected personal information contained in DMV records, they are shielded by the DPPA."[107] Because Congress "legislates with knowledge of the then-existing statutory landscape," courts "must presume that Congress knew of the potential interplay between the DPPA's privacy protections and the NVRA's disclosure mandate" and did not intend the DPPA to be undercut by the NVRA.[108] The Disclosure Provision is therefore subject to both prior and subsequent laws.[109] "[T]he term 'all records' in the disclosure provision does not encompass any relevant record from any source

---

[104]    *See Ma v. Ashcroft*, 361 F.3d 553, 558 (9th Cir. 2004) ("[S]tatutory interpretations which would produce absurd results are to be avoided.").

[105]    18 U.S.C. §§ 2721 *et seq.*

[106]    18 U.S.C. § 2721(a), (b).

[107]    *Boockvar*, 431 F. Supp. 3d at 562.

[108]    *Id.* at 563.

[109]    *NCBOE*, 996 F.3d at 268 ("[T]he Privacy Act, the Driver Protection Act, and any other statutory restrictions placed on the release of documents . . . may preclude the disclosure of documents" under the NVRA.).

whatsoever, but must be read in conjunction with the various statutes enacted by Congress to protect the privacy of individuals and confidential information held by certain governmental agencies."[110] Because the DPPA protects records against a broad reading of the Disclosure Requirement, so too does the LADMF.

The full NVRA, its legislative history, and other federal laws are inconsistent with PILF's broad interpretation of the NVRA. This Court should reject that interpretation, and hold that the ERIC deceased voter reports are not subject to disclosure.

### C. PILF's proposed interpretation undermines the NVRA's and PILF's own purposes.

A broad reading of the Disclosure Provision would also degrade the data states receive, making it more difficult for them to ensure the accuracy of their voter rolls. This cannot be Congress's intent, because it is contrary to the goals of the NVRA.[111] It is also contrary to PILF's stated goals.

Alaska is one of 31 states and the District of Columbia that is a member of ERIC and that receives deceased voter reports based on the LADMF.[112] If these reports were subject to the Disclosure Provision, the sensitive personal information they contain would be accessible to any organization regardless of whether it was certified, or eligible to be

---

[110]   *Id.* at 264.

[111]   *Hernandez*, 829 F.3d at 1073 (turning to statute's "broader structure" and "object and policy" to resolve ambiguity and determine Congress's intent) (internal quotation marks and citations omitted).

[112]   Doc. 1 at ¶ 13, n.2, 18–20.

Case 1:22-cv-00001-SLG     Document 40     Filed 09/12/22     Page 25 of 33

certified, under the statutorily mandated certification program.[113] And if a certified organization improperly discloses the information it receives, it would be subject to financial penalties and possible decertification.[114]

Applying the Disclosure Provision to ERIC's deceased voter reports would negate the LADMF certification program and undermine protections for the LADMF—protections that PILF has acknowledged exist.[115] It could also diminish ERIC's interest in providing LADMF information, if it faced potential financial penalties and decertification.[116] States would then have less accurate information about deceased voters and less accurate voter rolls, contrary to the NVRA's express purpose.[117] Congress

---

[113]     *See* 42 U.S.C. § 1306c(b), 26 U.S.C. § 6103(p)(4) (listing IRS requirements); 15 C.F.R. § 1110.102 (describing certification process); *Hosemann*, 43 F. Supp. 3d at 737 ("One of the reasons that governments seek to protect birthdates and SSNs from disclosure, and warn the public against voluntary disclosure of that information, is to mitigate the risk of identity theft."). *See also* Brian Naylor, Tighter Access to "Death Master File" Has Researchers Worried (January 6, 2014, 5:37 PM), https://www.npr.org/2014/01/06/260188571/tighter-access-to-u-s-deaths-list-has-researchers-grim (last visited September 7, 2022) (noting that limiting access to the DMF was estimated to save more than $700 million in fraudulent tax returns over 10 years); Irene Scharf, *The Problem of Appropriations Riders: The Bipartisan Budget Bill of 2013 As A Case Study*, 42 Mitchell Hamline L. Rev. 791, 806 (2016) ("According to a 2002 General Accountability Office (GAO) Report, the SSN is one of the three pieces of information most sought by identity thieves.").

[114]     *See* 15 C.F.R. § 1110.200. There is no specified penalty for the release of information by an *uncertified* organization, further demonstrating that sensitive personal information may be released only to certified entities.

[115]     Doc. 1 at ¶ 41; *see* Doc. No. 1-3 at 3.

[116]     15 C.F.R. § 1110.200(a)(1)-(2).

[117]     52 U.S.C. § 20501(b).

*Public Interest Legal Foundation v. Kevin Meyer*                Case No.: 1:22-cv-00001-SLG
Motion to Dismiss                                                              Page 26 of 33

plainly sought to both improve voter rolls and protect the information in the LADMF, and PILF should not be allowed to undercut these purposes.[118]

Indeed, applying the Disclosure Provision to ERIC's deceased voter reports would not even further PILF's stated purpose. Like the NVRA, PILF aims to keep voter rolls current and accurate.[119] By attempting to force the disclosure of information contained in the LADMF, PILF is jeopardizing states' receipt of this information, which is a crucial input in their list maintenance activities. Without it, voter rolls will not be as current or as accurate. PILF cites what it calls "Criticism of ERIC," but this criticism is not related to deceased voters and only describes alleged issues related to voter addresses and disenfranchisement of racial and ethnic minorities.[120] Unlike other cases that identified issues and records within the ambit of the NVRA, PILF has not alleged any issues with deceased voters in Alaska.[121] Nor does the existence of such criticism change or expand the reach of the Disclosure Provision. If PILF is concerned about voter fraud, that is

---

[118]     *See Ma*, 361 F.3d at 558.

[119]     Doc. 1 at ¶ 4.

[120]     *Id.* at ¶¶ 26-30.

[121]     *See Long*, 682 F.3d at 333 (finding that voter registration applications were subject to disclosure in a case alleging voter registration obstacles for students at historically African-American college); *Inter Tribal*, 570 U.S. at 20 (holding that NVRA precluded a state from requiring applicants to submit evidence of citizenship beyond that required by federal form).

beyond the scope of the NVRA.[122] And if PILF wants to assess the Division's

compliance with the NVRA and assist with its list maintenance activities,[123] it already

has all the data it needs: the Division's list of the voters it actually removed during the

years PILF identified.

Because legislative history, other federal laws, the NVRA's purpose, and PILF's

own ends reinforce the plain meaning of the Disclosure Provision, it does not apply to

ERIC's deceased voter reports and PILF fails to state a claim.

## III. Because it already has the information it now demands, PILF fails to state a claim for the Division's deceased voter list.

PILF's claim to the deceased voter records the Division already provided also fails

to state a viable cause of action. In its complaint, PILF demands "deceased cancellation

reports with voter identification numbers."[124] But the Division already provided the list of

deceased voters it removed from the voter rolls, with a unique identification number for

each voter. The Division provided the voters' "ascension numbers," which are different

than their "voter identification numbers."[125] While both are assigned by the Division and

unique to each voter, voter identification numbers are protected by state law and

---

[122]  *Hosemann*, 43 F. Supp. 3d at 722 ("The NVRA was not designed as a tool to root out voter fraud, 'cross-over voting,' or any other illegal or allegedly illegal activity associated with casting a ballot on election day.").

[123]  Doc. 1 at ¶ 50.

[124]  Doc. 1, Prayer for Relief at ¶ 2.

[125]  AS 15.07.195(a)(4), (d).

ascension numbers are not.[126] As the Division explained to PILF, it withheld only voters'

dates of birth,[127] and it provided a unique identification number—the ascension

number—for each voter. In its letter notifying the Division of an alleged NVRA

violation, PILF noted the withheld dates of birth, but did not demand the Division's list

of deceased voters with "voter identification numbers."[128] PILF stated its "request can be

lawfully and amicably satisfied" if the Division provided redacted versions of ERIC's

deceased voter reports.[129] Because the Division provided unique identification numbers

and PILF's notice letter did not demand "voter identification numbers," PILF did not

provide notice of this alleged violation, as required to confer a private right of action.[130]

If, despite its inadequate notice and complaint, PILF actually seeks the Division's

deceased voter list with dates of birth, the NVRA does not require that the Division

provide them. Dates of birth are protected from disclosure under both federal and state

law. Congress, in enacting the NVRA, did not "intend[] to erode Federal and State law

protecting against the disclosure of private, personal information."[131] While states must

---

[126]    *Id.* Voter identification numbers are protected as an election security measure, because they can be used to verify a voter's identity. *See* 6 AAC 25.510.

[127]    Doc. 1-2 at 1.

[128]    Doc. 1-3 at 2

[129]    *Id.* at 3.

[130]    52 U.S.C. § 20510(b)(2).

[131]    *Kemp*, 208 F. Supp. 3d at 1345; *see Hosemann*, 43 F. Supp. 3d at 739 ("There is no indication in the NVRA's legislative history that Congress intended to open up for inspection information within those records that is otherwise protected as personal information under other Federal or State laws.").

disclose "lists of names and addresses" of recipients of change-of-address notices, Congress did not require the disclosure of Social Security numbers or birthdates, "recogniz[ing] that other voter registration information may be sensitive and not subject to disclosure."[132] Congress has repeatedly indicated a "concern for individuals' privacy interests" and did not, by enacting the NVRA, intend to gut the protections afforded by other federal laws.[133] PILF's broad interpretation of the disclosure provision would "create a gaping hole in the . . . statutory landscape whereby personal, otherwise protected information would lose its protection once a citizen registered to vote."[134]

Nor does the NVRA preempt the protections for personal information in Alaska Statute 15.07.195.[135] This statute makes confidential, and not open to public inspection, certain information in voter registration records, including dates of birth and voter identification numbers. Such sensitive personal information can properly be excluded from disclosure under the NVRA.[136] One court has held that dates of birth must be

---

[132]    *Hosemann*, 43 F. Supp. 3d at 734.

[133]    *Id.* at 735.

[134]    *Id.*; *see also Kemp*, 208 F. Supp. 3d at 1344 (noting that Disclosure Provision "does not require the disclosure of sensitive information that implicates special privacy concerns").

[135]    Doc. 1 at ¶ 58.

[136]    *See NCBOE*, 996 F.3d at 267 (noting that a "district court can order redaction of 'uniquely sensitive information' in otherwise disclosable documents" (quoting *Long*, 682 F.3d at 339)); *Kemp*, 208 F. Supp. 3d at 1344 (concluding that the disclosure provision "does not require the disclosure of sensitive information that implicates special privacy concerns"); *Hosemann*, 43 F. Supp. 3d at 739 (holding that the disclosure

disclosed, but only when they are not protected by state law.[137] Here, Alaska law expressly protects this information.

PILF's second claim fails regardless of whether it demands the Division's list of deceased voters with voter identification numbers or dates of birth. PILF did not notice or plead a violation with regards to voter identification numbers and the Division already provided ascension numbers, which are unique identification numbers. And if PILF actually wants dates of birth, these are not subject to disclosure under the NVRA.

## CONCLUSION

Because PILF fails to state a claim under the NVRA with respect to either ERIC's deceased voter reports or the Division's deceased voter list, the Court should grant this motion and dismiss PILF's Complaint with prejudice.

DATED: September 12, 2022.

TREG R. TAYLOR
ATTORNEY GENERAL


By:     /s/ *Thomas S. Flynn*
        Thomas S. Flynn
        Assistant Attorney General
        Alaska Bar No. 1910085
        Department of Law
        1031 West Fourth Avenue, Ste. 200

---

provision "does not require the disclosure of unredacted voter registration documents, including voter registrant birthdates").

[137]    *Jud. Watch, Inc. v. Lamone*, 455 F. Supp. 3d 209, 211, 225 (D. Md. 2020) (noting that the Maryland legislature "has not enacted a law safeguarding birthdates from disclosure in [this] context").

Anchorage, AK 99501
Phone:  (907) 269-6612
Facsimile:  (907) 258-4978
Email:  thomas.flynn@alaska.gov
Attorney for the State of Alaska

**Certificate of Service**

I certify that on September 12, 2022 the foregoing **MOTION TO DISMISS** was served electronically on:

Maureen Riordan
Public Interest Legal Foundation
32 East Washington Street, Suite 1675
Indianapolis, IN 46204-3594

Kaylan Phillips
Public Interest Legal Foundation
32 East Washington Street, Suite 1675
Indianapolis, IN 46204-3594

Noel Johnson
Public Interest Legal Foundation
32 East Washington Street, Suite 1675
Indianapolis, IN 46204-3594

/s/ *Thomas S. Flynn*
Thomas S. Flynn
Assistant Attorney General